1

2

3

4                          UNITED STATES DISTRICT COURT

5                       NORTHERN DISTRICT OF CALIFORNIA

6

7   GREGORY A BANKS, et al.,                Case No. 18-cv-07391-HSG

8                Plaintiffs,                **ORDER GRANTING IN PART AND**
                                            **DENYING IN PART MOTION FOR**
9        v.                                 **SUMMARY JUDGMENT**

10  MICHAEL MORTIMER, et al.,               Re: Dkt. No. 89

11               Defendants.

12

13        This civil rights lawsuit arises from the fatal shooting of Nathan Banks on the evening of

14  June 16, 2017.  The plaintiffs in this case are Mr. Banks's father (Greg Banks), daughter (Alexis

15  Avalos) and mother (Dawn Marie Delucchi) (collectively, ("Plaintiffs")).  *See* Dkt. Nos. 52, 86.

16  They have sued the City of Antioch and Officers Michael Mortimer and Ryan White of the

17  Antioch Police Department.  The Court has bifurcated the trial and discovery of Plaintiffs' claims

18  against Officer Mortimer and Officer White (together, ("Defendants")) from their claims against

19  the City of Antioch.  *See* Dkt. No. 65.

20        Before the Court is Defendants' motion for summary judgment, which is fully briefed.  *See*

21  Dkt. Nos. 89 ("Mot."), 94 ("Opp."), 98 ("Reply").  The Court held a hearing on June 30, 2022.

22  Dkt. No. 105.  It then directed the parties to file supplemental briefs on the question of Officer

23  Mortimer's qualified immunity.  *See* Dkt. Nos. 104, 106 ("Pls. Sup. Br."), 108 ("Defs. Sup. Br.").

24  Having now considered the full record and the parties' briefs, the Court **GRANTS IN PART and**

25  **DENIES IN PART** Defendants' motion for summary judgment.

26  I.   **BACKGROUND**

27       A.   **Factual Allegations**

28            On the night of June 16, 2017, Officer Mortimer was patrolling the Sycamore Drive area of

United States District Court
Northern District of California

Antioch, California in a marked police SUV (the "SUV").  *See* Dkt. No. 52 ("FAC") ¶ 50; Mot. at 2.  While driving on Manzanita Way around 11:00 p.m., Officer Mortimer spotted Jennifer Caldwell sitting in a parked white Volkswagen (the "Volkswagen") with a man in the front passenger seat.  *See* Mot. at 2; Opp. at 3.  He approached with bright white police lights on, as shown below.



*See* Dkt. No. 93, Declaration of Daniel Boord ISO Plaintiffs' Opposition To Defendants' Motion For Summary Judgment ("Boord Decl."), Ex. 1.C.  Officer Mortimer alleges that he eventually recognized the man sitting in the passenger seat of the Volkswagen and identified him as Nathan Banks.  *See* Mot. at 2; Opp. at 4.  Having identified Mr. Banks, Officer Mortimer got out of his police car and approached the Volkswagen.  *See ids.*

      After that point, the accounts diverge.  The following subsections of this Order summarize

2

the night from the perspective of the two key witnesses, Jennifer Caldwell and Officer Mortimer, as well as other key evidence in the record.  These subsections should not be construed as resolving any disputed question of fact.

> ### i.   Jennifer Caldwell Testimony

The following account is taken from the declaration and deposition of Jennifer Caldwell. *See* Boord Decl., Ex. 1 ("Caldwell Dep."); Ex. 2 ("Caldwell Decl.").[1]

On the night of June 16, 2017, at around 11:00 p.m., Jennifer Caldwell left her house and sat in her parked car to cool off after a domestic dispute.  Dkt. No. 93 at 45.  While she was sitting there, her "good friend" Nathan Banks, who she had known for at least ten years, entered Ms. Caldwell's car, and sat in the passenger seat.  *Id.* at 46.  It was not unusual for him to stop by and check on Ms. Caldwell.  *Id.* at 45.  Mr. Banks was dressed in jeans and a t-shirt and was not carrying anything other than a "kind of bulky" cell phone.  *Id.* at 19, 45.

After a few minutes of talking, Mr. Banks and Ms. Caldwell saw an Antioch police SUV drive toward them with bright white police lights and spotlights on.  *Id.* at 20, 46-47.  They confirmed to each other that they had nothing illegal in the car or in their possession.  *Id.* at 20, 46. The SUV came to a stop next to them.  *Id.* at 47.  All the windows in the Volkswagen and the driver side window of the SUV were down.  *Id.*  The man in the SUV, who both Ms. Caldwell and Mr. Banks recognized to be Officer Mortimer, said hello to Ms. Caldwell and asked her who was in the car with her.  *Id.*  She replied "Charlie," which was Mr. Banks's nickname, and then clarified that the passenger was "Nathan Banks."  *Id.*

Officer Mortimer got out of the SUV and walked around the front of the car toward the passenger door.  *Id.*  Ms. Caldwell wrote in her declaration that Officer Mortimer had a flashlight and pistol "out" as he did so, but at her deposition, she appeared to clarify that Officer Mortimer

---

[1] Citations to the declaration and deposition of Jennifer Caldwell refer to ECF pagination.  Both documents are at Docket No. 93.  Unless otherwise indicated, however, citations to the record otherwise refer to pagination provided by the specific document referenced rather than ECF pagination.  Both parties separately filed and often cited to different excerpts of the same document, so this method is the Court's attempt to ensure consistency.

United States District Court
Northern District of California

only had his flashlight out at this point. *See id.* at 21 ("It happened really fast, so I don't -- when he first walked up to the car, no, he did not have his gun out, just the flashlight out."). As Officer Mortimer approached the passenger side door, Mr. Banks turned and opened the door by about an inch. *Id.* at 47. Ms. Caldwell wrote in her declaration that at this point both she and Nathan knew that Officer Mortimer "was going to get Nathan out of the car to question and search him." *Id.* At this time, Ms. Caldwell observed Mr. Banks to be calm and relaxed. *Id.* at 47-48. Ms. Caldwell does not remember exactly what Officer Mortimer said to Mr. Banks as he pushed the door slightly open, but she remembers that Officer Mortimer told him to stay in the car. *Id.* at 24, 48. Ms. Caldwell also recalls that at this point Officer Mortimer had pulled his gun out along with his flashlight. *Id.* at 24.

Officer Mortimer then swung his flashlight and struck a "hard blow" to Mr. Banks's head, leaving blood "everywhere," including on the Volkswagen's dashboard and on Ms. Caldwell's clothes. *Id.* at 24, 48. After Mr. Banks was struck, he pushed the passenger side door open, causing Officer Mortimer to stumble. *Id.* at 48. Mr. Banks then jumped out of the Volkswagen and ran south up the street. *Id.* Officer Mortimer regained his balance and chased him. *Id.* at 48-49. Ms. Caldwell heard Officer Mortimer tell Mr. Banks to stop "pretty quickly after he got out of the vehicle." *Id.* at 34.

Ms. Caldwell wrote that she had an "excellent view" of Mr. Banks as he ran away because the police SUV's lights illuminated the street. *Id.* at 48. She wrote that Mr. Banks "may have been carrying a normal size cell phone but had nothing else in his hands," and that "there is no way that he was carrying a pistol or weapon of any kind." *Id.* Mr. Banks ran two houses down and then turned into a side yard. *Id.* at 49. Ms. Caldwell saw Officer Mortimer follow and then heard gunfire. *Id.* Officer Mortimer then returned to the street, told Ms. Caldwell "don't [expletive] move," and called dispatch. *Id.* She asked Officer Mortimer, "what the [expletive] did you do?" *Id.* at 35. He responded, "you don't point guns at cops." *Id.* Within minutes, multiple officers arrived on the scene and Officer Mortimer was gone. *Id.* at 49.

4

### ii.    Officer Mortimer & Officer White Testimony

The following account is taken from the deposition and "Coroner's Inquest Testimony" of Officer Michael Mortimer, as well as the deposition of Officer Ryan White. *See* Dkt. No. 89-1, Declaration of Noah G. Blechman ISO Defendants' Motion for Summary Judgment ("Blechman Decl."), Ex. B. ("Mortimer Dep."), Ex. C ("Mortimer Coroner Statement"), Ex. F ("White Dep.").[2]

On the night of June 16, 2017, at around 11:00 p.m., Officer Mortimer was patrolling the Sycamore Drive area in uniform and in a marked police SUV.  Mortimer Dep. at 90.  He often patrolled that neighborhood because it is a "high crime area," known for "drugs, violence, weapons, stolen cars, [and] gangs." *Id.* at 109.  He patrolled with an active "scene light," which is a "very strong light" capable of lighting up an entire block. *Id.* at 90-91.  As he was driving north, he saw two people sitting in the Volkswagen, and he noticed that the passenger "appeared to start getting very nervous." *Id.* at 110.  The passenger's face "really stood out" to Officer Mortimer and gave him a "bad feeling." *Id.* at 115, 121.

Officer Mortimer approached in the SUV, greeted the driver, Jennifer Caldwell, and asked her who was with her. *Id.* at 119.  Jennifer responded that she was with "Nate." *Id.*  Officer Mortimer then immediately recognized the man sitting in the passenger seat and identified him as Mr. Banks. *Id.* at 115, 119.  He recalled that Mr. Banks had been arrested with firearms in the past. *Id.* at 62.  Officer Mortimer then got out of the SUV to make "consensual contact." *Id.* at 121.  At this point, when Officer Mortimer left the SUV to talk with Mr. Banks, he did not suspect him of committing a crime. *Id.* at 126.  Officer Mortimer approached the passenger side window, which was at least partially down, and stood about one or two feet away. *Id.* at 127.  Officer Mortimer asked Mr. Banks some questions, which he answered "reasonably" despite appearing nervous and fidgety. *Id.* at 129-130.

Officer Mortimer and Mr. Banks spoke for a few seconds before "something clicked," and

---

[2] The deposition of Antioch Police Department Officer Michael Mortimer is reproduced more fully in an attachment to Plaintiff's counsel's declaration. *See* Dkt. No. 93, Ex. 2.  Citations to the depositions of Officers Mortimer and White refer to the relevant deposition transcripts rather than ECF pagination.

United States District Court
Northern District of California

Mr. Banks went from being nervous to moving "extremely fast." *Id.* at 131. Mr. Banks quickly reached for something behind his back with his left hand while almost simultaneously trying to open the passenger side door by about one foot, which caused the door to hit Officer Mortimer in his left leg. *Id.* at 135-36, 138. At that point, Officer Mortimer physically blocked Mr. Banks from opening the door all the way, and he ordered Mr. Banks to show his hands. *Id.* at 139. Officer Mortimer testified that at this point he had not seen anything illegal anywhere near Mr. Banks. *Id.* Officer Mortimer then struck Mr. Banks with a flashlight to get him to comply with Officer Mortimer's order to show his hands. *Id.* at 145. After Officer Mortimer struck Mr. Banks, he thought he saw the barrel of a semi-automatic gun in Mr. Banks's left hand, but he was not certain. *Id.* at 154-55. He then saw Mr. Banks reach across Ms. Caldwell, which led him to believe that Mr. Banks was attempting to discard the gun he thought he had seen. *Id.* at 155-56.

Officer Mortimer then unholstered his own gun and decided to try to get Mr. Banks out of the Volkswagen to place him under arrest. *Id.* at 157-58. Officer Mortimer tried to grab Mr. Banks to perform a "circle takedown" maneuver, but Mr. Banks broke free and started running south. *Id.* at 159-160. As Mr. Banks ran, Officer Mortimer is certain that he saw a gun in Mr. Banks's left hand. *Id.* at 160, 187. With his own gun and flashlight in hand, Officer Mortimer chased Mr. Banks into a dark breezeway. *Id.* at 180-81. Officer Mortimer recalls telling Mr. Banks to stop running. *Id.* at 186. When Officer Mortimer turned the corner into the breezeway, he saw Mr. Banks halfway on top of a gate, as if he was straddling it, and Officer Mortimer saw a gun pointed right at him. *Id.* at 181-82, 188, 190. In Officer Mortimer's Coroner's Inquest Testimony, however, he testified that Mr. Banks was "not sitting on the fence waiting" but was rather "going over" the fence in "one fluid movement." *See* Dkt. No. 93 at 192. But in any event, Officer Mortimer says he thought Mr. Banks was going to try to kill him. Mortimer Dep. at 208. Officer Mortimer shot towards Mr. Banks three times and then retreated to a safe location to call dispatch. *Id.* at 183-84. Shortly afterwards, Officer White arrived on the scene. *Id.* at 207.

When Officer White arrived, he immediately noticed a black semi-automatic firearm

6

within one to two inches of Mr. Banks's right hand.  White Dep. at 161.  Officer White then deployed his K-9 dog to apprehend (which means "bite and hold") Mr. Banks while Officer White used his foot to slide the gun away from Mr. Banks.  *Id.* at 163, 165.  Once the gun was out of reach, Officer White realized that Mr. Banks was not responding to the K-9 apprehension and did not appear to be conscious.  *Id.*

### iii.   Post-Shooting Evidence

The Contra Costa County Sheriff's Office Coroner's Division performed an autopsy on June 19, 2017, and determined that Mr. Banks suffered three gunshot wounds.  Blechman Decl., Ex. I.  One was to the left side of his head and the other two were to the left side of his chest.  *Id.* A toxicology analysis found marijuana and methamphetamine present in Mr. Banks's blood.  *Id.*, Ex. K.  The Contra Costa County Crime Lab conducted DNA tests on a handgun submitted as evidence and concluded that Mr. Banks "likely is the source" of the DNA obtained from the gun. *Id.*, Ex. I.

Security video footage from two cameras across the street captured the chase into the breezeway.  *See* Dkt. Nos. 89-1, 89-2 (Exs. P-7, P-8).  From those videos, the Court gathers the following facts.  Mr. Banks entered the breezeway seconds before Officer Mortimer.  It is not clear whether he held anything in his hands as he did so.  Officer Mortimer chased him into the breezeway.  In the breezeway, Mr. Banks climbed onto what appears to be a garbage can in an attempt to climb over the fence.  Officer Mortimer continued towards the fence and shined his duty flashlight at Mr. Banks.  The fatal shooting itself is not visible on the video.

Defendants' shooting incident analysis and reconstruction expert, Alexander Jason, opined that the gunshot wounds sustained by Mr. Banks are consistent with Officer Mortimer's description of the incident.  *See* Blechman Decl., Ex. N.  Specifically, he found the gunshot wound to Mr. Banks's left upper arm to be consistent with Mr. Banks pointing a handgun with his left hand at Officer Mortimer.  *Id.* at 3-13.  Mr. Jason also opined that Officer Mortimer's firing of three shots at Mr. Banks was a controlled and restrained defensive reaction to observing a handgun

7

pointed at him.  *Id.* at 13.

Plaintiffs' experts disagree.  Their ballistics expert, Chris Coleman, reviewed the security camera footage frame-by-frame and opined that Mr. Banks and Officer Mortimer were in the breezeway together for 2.2 seconds.  Boord Decl., Ex. 4 ("Coleman Report") at 2.  Based on his review of the footage, he concluded that Mr. Banks never turned to face Officer Mortimer in the breezeway.  *Id.* at 4.  Mr. Coleman also opined that the bullet trajectories and security footage were "consistent with Mr. Banks' body being up on the fence in the process of going over, with the left side of his body facing out toward Officer Mortimer, and his chest facing the ground when he was shot through the arm and into his chest."  *Id.* at 6.  Plaintiffs also retained biomechanical engineer Dr. Jesse Wobrock to rebut Mr. Jason's opinions.  Based on Dr. Wobrock's review of the bullet entry angle, he opined that Mr. Banks was not pointing a weapon at Officer Mortimer while he was climbing the fence.  Boord Decl., Ex. 5 ("Wobrock Report").

## B.    Procedural Posture

Mr. Banks's father (Greg Banks) and daughter (Alexis Avalos) filed the operative complaint in January 2021, naming the City of Antioch and Officers Michael Mortimer and Ryan White as defendants.  *See* FAC.  The Complaint brings claims under the Fourth and Fourteenth Amendments to the U.S. Constitution, as well as claims under California state law.  *See id.* Defendants filed a motion to dismiss Plaintiffs' municipal and supervisory liability claims, which the Court denied without prejudice in April 2021.  Dkt. No. 65.  The Court instead bifurcated the trial and discovery of Plaintiffs' claims against Officer Mortimer and Officer White from their municipal and supervisory claims against the City of Antioch.  *Id.*  Fact and expert discovery have now closed, and Officer Mortimer and Officer White move for summary judgment.  Dkt. No. 89.

## II.    LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute is "genuine" if there is evidence in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party.  *Id.* The Court views the inferences reasonably drawn from the materials in the record in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986), and "may not weigh the evidence or make credibility determinations," *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884-85 (9th Cir. 2008).

The moving party bears both the ultimate burden of persuasion and the initial burden of producing those portions of the pleadings, discovery, and affidavits that show the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the moving party will not bear the burden of proof on an issue at trial, it "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  Where the moving party will bear the burden of proof on an issue at trial, it must also show that no reasonable trier of fact could not find in its favor.  *Celotex Corp.*, 477 U.S. at 325.

In either case, the movant "may not require the nonmoving party to produce evidence supporting its claim or defense simply by saying that the nonmoving party has no such evidence." *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1105.  "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial."  *Id.* at 1102–03. "If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense."  *Id.* at 1103.  In doing so, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.  A nonmoving party must also "identify with reasonable

9

particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). If a nonmoving party fails to produce evidence that supports its claim or defense, courts enter summary judgment in favor of the movant. *Celotex Corp.*, 477 U.S. at 323.

## III.  DISCUSSION

Officer Mortimer and Officer White move for summary judgment on each of Plaintiffs' federal and state law claims. Plaintiffs do not oppose summary judgment on their claims against Officer White or their claims against all defendants based on the alleged denial of medical care to Mr. Banks. The Court will accordingly grant summary judgment as to those claims.

Otherwise, this is a case with very few undisputed facts. Plaintiffs allege that Officer Mortimer arrested Mr. Banks with no discernible basis for probable cause and used deadly force on a fleeing suspect who posed no threat. Officer Mortimer strongly disputes those facts and claims he had clear probable cause to arrest and only used deadly force because Mr. Banks pointed a gun at him. The factual basis for most of Officer Mortimer's arguments, however, is primarily his own declaration, buttressed by the opinions of his expert, Alexander Jason. But since Officer Mortimer has moved for summary judgment, the Court must evaluate the evidence in the record in the light most favorable to Plaintiffs. That is why many of the facts presented below are taken from either the account of Plaintiffs' key witness, Ms. Caldwell, or their key experts. Of course, those facts may later be rebutted or undermined. But, as explained below, they generally suffice to create triable issues of fact as to the core of Plaintiffs' federal and (largely derivative) state claims.

### A.  Federal Claims

Officer Mortimer moves for summary judgment on Plaintiffs' claims under the Fourth and Fourteenth Amendments. Officer Mortimer generally alleges that, as a matter of law, he is not liable because he acted reasonably in detaining and using force against Mr. Banks. He also contends that he is in any event shielded from each of Plaintiffs' federal claims by the doctrine of qualified immunity. *See* Mot. at 12.

That doctrine protects government officials from liability for civil damages as long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It is supposed to give government officials "breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (citations omitted). And in theory, it protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* (citations omitted).

When considering a claim of qualified immunity, courts first consider whether the plaintiff's constitutional right was violated and then ask whether that right was "clearly established" when the violation happened. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citations omitted). An officer cannot be said to have violated a "clearly established right" unless the right's contours were sufficiently definite that any reasonable officer would have understood that they were violating it. *City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (citations omitted). While this does not require a case directly on point, existing precedent must have placed the statutory or constitutional question "beyond debate." *al-Kidd*, 563 U.S. at 741.

Courts may choose which prong to address first. *Pearson*, 555 U.S. at 236. Under either prong, though, the Court may not resolve genuine disputes of fact in favor of the party seeking summary judgment, and must, as in other cases, view the evidence in the light most favorable to the nonmovant. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). Because Officer Mortimer raises the defense of qualified immunity for each of Plaintiffs' federal claims, the Court will analyze those claims through the lens of the two-pronged test outlined above.

### i.   Unlawful Detention and Arrest

Plaintiffs' first claim alleges that Officer Mortimer detained Mr. Banks without reasonable suspicion and arrested him without probable cause. FAC ¶ 60. Officer Mortimer contends that he is entitled to summary judgment on this claim because any detention or arrest was justified by

11

reasonable suspicion and probable cause.  *See* Mot. at 13.  And even if a constitutional violation occurred, Officer Mortimer contends, he is immune because he did not violate a "clearly established" right.  *See id.* at 18.  As explained below, the Court finds that genuine issues of material fact preclude summary judgment on the first ground but not the second.

### a.  Constitutional Violation

The Fourth Amendment protects individuals against "unreasonable searches and seizures." U.S. Const. amend. IV.  Caselaw defines two categories of police seizures.  The first is called *Terry* stops, after the U.S. Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968).  *Terry* held that police may engage in brief, investigative stops of an individual if they have "reasonable suspicion" that the person is committing or has committed a crime.  *Arizona v. Johnson*, 555 U.S. 323, 326, 129 S. Ct. 781 (2009).  To determine whether an officer had reasonable suspicion to engage in an investigative stop, courts examine the "totality of the circumstances" and assess whether the officer had a "particularized and objective basis" for suspecting criminal wrongdoing.  *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744 (2002) (internal quotation marks omitted).  "Seemingly innocuous behavior," unless combined with other circumstances indicating criminality, does not justify an investigative stop, and an officer cannot rely on generalizations that "would cast suspicion on large segments of the law-abiding population."  *United States v. Manzo-Jurado*, 457 F.3d 928, 935 (9th Cir. 2006).

The second category of police seizures are arrests.  An arrest must be supported by probable cause that the person being arrested has committed a crime.  *See Reynaga Hernandez v. Skinner*, 969 F.3d 930, 938 (9th Cir. 2020).  Probable cause is more difficult to establish than reasonable suspicion, and it is determined at the time the arrest is made.  *See Arvizu*, 534 U.S. at 273-74.  It must be based on "reasonably trustworthy information sufficient to warrant a prudent person in believing that the accused had committed or was committing an offense."  *Reynaga Hernandez*, 969 F.3d at 938 (citations omitted).  Like reasonable suspicion, it can "only exist in relation to criminal conduct."  *Id.*

12

To assess whether Plaintiffs can prevail on their unlawful arrest claim, the Court must answer three questions: (1) when or whether a seizure occurred; (2) if a seizure did occur, whether it was a detention or an arrest; (3) whether the seizure was justified by either reasonable suspicion or probable cause.  The Court takes those questions in turn.

### 1.  Was Mr. Banks Seized?

Plaintiffs allege that Officer Mortimer seized Mr. Banks by blocking him from getting out of the Volkswagen, aiming a firearm at him, and ultimately striking him in the head with a flashlight, causing serious injuries.  FAC ¶ 60.  Based on the evidentiary record, the Court finds that a reasonable juror could conclude that Officer Mortimer seized Mr. Banks.[3]

A person is "seized" when police act in such a way that communicates to them that they are not free to ignore the police and go about their business.  *Florida v. Bostick*, 501 U.S. 429, 437, 111 S. Ct. 2382 (1991).  This is an objective analysis from the perspective of a reasonable person.  *Id.*  The Ninth Circuit has explained that there are several factors to consider when determining if a person was seized, like: (1) the number of officers; (2) whether weapons were displayed; (3) whether the encounter occurred in a public or non-public setting; (4) whether the officer's tone or manner was authoritative, so as to imply that compliance would be compelled;

---

[3] As pled in the operative complaint, Plaintiffs' unlawful arrest claim against Officer Mortimer is based on the allegation that Officer Mortimer blocked Mr. Banks from getting out of the Volkswagen, pointed a gun at him, and struck him in the head with a flashlight.  *See* FAC ¶ 60 ("When Defendants MICHAEL MORTIMER, SUPERVISORY APD DOES, and APD OFFICER DOES obstructed Decedent from exiting the car, caused serious injuries to his head, and aimed their firearm at Decedent, the aforementioned defendants violated Decedent's constitutional right").  At various points in their Opposition Brief, however, Plaintiffs appear to assert the new theory that Officer Mortimer's initial encounter with Ms. Caldwell and Mr. Banks also constituted an unlawful detention.  *See* Opp. at 10-12.  This is improper.  It is well-established that plaintiffs must adequately allege the facts underlying their claims and may only add new theories of liability by moving to amend their pleadings.  Summary judgment is simply not the place for new theories.  *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000); *Wasco Prod., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("The necessary factual averments are required with respect to each material element of the underlying legal theory.... Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings.") (citations omitted and alterations adopted).

and (5) whether the officers informed the person of his right to terminate the encounter. *United States v. Washington*, 490 F.3d 765, 771-72 (9th Cir. 2007). Any one of those factors, if present, can establish a seizure. *Id.*

In this case, a reasonable juror could easily conclude that Mr. Banks was seized. Jennifer Caldwell, who sat and watched from the driver seat of the Volkswagen while Mr. Banks was allegedly seized, testified that as Mr. Banks attempted to get out of the Volkswagen, Officer Mortimer asked, "Why the [expletive] you opening the door?" and had taken out his gun. *See* Caldwell Dep. at 70-71, 161-163. She also testified that Officer Mortimer ultimately opened the passenger-side door and struck Mr. Banks with a flashlight, leaving his head bloodied. *See id.* at 71. The core of those facts is not seriously in dispute. Officer Mortimer has also testified that he physically blocked Mr. Banks from fully opening the passenger-side door and ordered him to show his hands. Mortimer Dep. at 139. He also admits that he struck Mr. Banks with a flashlight to get him to comply with an order to show his hands. *Id.* at 145.

Viewing the facts in the light most favorable to Plaintiffs, Officer Mortimer's conduct could be found to communicate to a reasonable person that they were not free to ignore the police. *Bostick*, 501 U.S. at 437. When an armed officer gives you a command, physically blocks you from leaving your car, and then strikes you in your head, it is reasonable to conclude that you are not free to ignore him. *See Washington*, 387 F.3d at 1068 ("A seizure occurs when a law enforcement officer, through coercion, physical force, or a show of authority, in some way restricts the liberty of a person."). The Court finds that a reasonable juror could conclude that Mr. Banks was seized and accordingly moves to the next step of the analysis.

### 2. Was Mr. Banks Detained or Arrested?

If Officer Mortimer seized Mr. Banks, the next question is whether that seizure was a detention (i.e., investigative stop) or a full-scale arrest. This is a question of "great importance" because it often determines whether the police conduct was lawful or not, since only arrests must be justified by probable cause. *Washington v. Lambert*, 98 F.3d 1181, 1185-86 (9th Cir. 1996). A

14

person is arrested, as opposed to merely detained, if a reasonable person in their shoes would conclude that they are not free to leave even after brief questioning from the officer. *Stevens v. Rose*, 298 F.3d 880, 883 (9th Cir. 2002).

Again, Ms. Caldwell testified that as part of the seizure Officer Mortimer swung his flashlight and struck a "hard blow" to Mr. Banks's head, leaving blood "everywhere," including on the Volkswagen's dashboard and on her clothes. *See* Dkt. No. 93 at 48. One might assume that Officer Mortimer's use of force means that Mr. Banks was necessarily arrested rather than merely detained. But the Ninth Circuit has held that officers do not necessarily make an arrest just because they use force on a suspect. *See Stevens*, 298 F.3d at 883-84. There is a logic to this. All seizures—including investigative stops—are involuntary to some degree because, when seized, the suspect is not free to end the encounter. *See Bostick*, 501 U.S. at 437. After all, the whole point of an investigative stop is to allow police to investigate a potential crime. *See Gallegos v. City of Los Angeles*, 308 F.3d 987, 991 (9th Cir. 2002) ("The whole point of an investigatory stop, as the name suggests, is to allow police to *investigate*") (emphasis in original). And if police automatically converted an investigative stop into an arrest simply by using force, suspects could thwart any investigative stop by not cooperating and fleeing.[4] To avoid that absurdity, courts determine whether a seizure was an investigative stop or an arrest by evaluating not only whether an officer used force, but also whether that force was reasonable under the specific circumstances. *See Lambert*, 98 F.3d at 1185. Put doctrinally, officers may restrict liberty to maintain the status quo while making an initial inquiry during a *Terry* stop, but only "if the force displayed is not excessive under the circumstances." *United States v. Patterson*, 648 F.2d 625, 633 (9th Cir. 1981). Ultimately, this is a fact-intensive inquiry that is usually best left to the jury. *Green v. City*

---

[4] *See, e.g.*, *United States v. Patterson*, 648 F.2d 625, 633 (9th Cir. 1981) ("A valid stop is not transformed into an arrest merely because law enforcement agents momentarily restrict a person's freedom of movement . . . . A contrary result would leave agents powerless to perform their investigative functions without the cooperation of suspects."); *see also Leibel v. City of Buckeye*, 556 F. Supp. 3d 1042, 1068-69 (D. Ariz. 2021), *appeal dismissed sub nom. C.L. by & through Kevin v. Grossman*, No. 21-16524, 2022 WL 780439 (9th Cir. Jan. 21, 2022).

& *Cnty. of San Francisco*, 751 F.3d 1039, 1047 (9th Cir. 2014) (noting that this inquiry is "fact specific" and "often left to the determination of a jury") (citations omitted).

Here, a reasonable jury could conclude that Officer Mortimer's initial seizure of Mr. Banks was an arrest rather than an investigative stop. The severity of Officer Mortimer's flashlight strike alone, which allegedly left Mr. Banks bleeding profusely, could communicate to a reasonable person that they would not be free to leave even after brief questioning. *See* Dkt. No. 93 at 48; *Stevens*, 298 F.3d at 884 ("The officers subdued him using sufficient force to send him to the hospital. Under these circumstances, it would have been decidedly unreasonable to assume that 'he was free to leave after brief questioning.'") (citations omitted). But on top of that, a juror could also find this use of force disproportionate and unnecessary since Officer Mortimer admits that, up until this point, he had not seen Mr. Banks engage in any illegal activity whatsoever. *See* Mortimer Dep. at 139-143. The Court accordingly finds that a reasonable jury could conclude that Officer Mortimer arrested Mr. Banks when he struck him with the flashlight.

### 3.  Was Mr. Banks' Seizure Justified?

Plaintiffs' unlawful arrest claim ultimately hinges on whether Officer Mortimer's seizure of Mr. Banks was justified. For the reasons explained above, the Court assumes that Officer Mortimer arrested Mr. Banks when he blocked him from getting out of the Volkswagen and struck him with the flashlight. The next question is whether Officer Mortimer had probable to cause to make that arrest. Viewing the evidence in the light most favorable to Plaintiffs, the Court finds that a reasonable juror could conclude that he did not.

Probable cause to arrest exists when, under the totality of circumstances known to the arresting officer, a reasonable person would conclude that there is a fair probability that the suspect had committed or is committing a crime. *United States v. Lopez*, 482 F.3d 1067, 1072-73 (9th Cir. 2007) (citing *Beck v. Ohio,* 379 U.S. 89, 91, 85 S. Ct. 223 (1964)). An officer can have probable cause without conclusive evidence of guilt, but mere suspicion, common rumor, or even strong reason to suspect are not enough. *Id.* Probable cause is an objective standard, which means

that the arresting officer's intent is irrelevant.  *See Devenpeck v. Alford*, 543 U.S. 146, 153, 125 S. Ct. 588 (2004) ("Our cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause.") (citations omitted).

Officer Mortimer cites two potential misdemeanors as the basis for probable cause.  *See* Mot. at 16.  He first contends that he had probable cause to arrest Mr. Banks because he saw Mr. Banks commit "battery on a peace officer."  *Id.*  In California, battery on a peace officer is when a defendant willfully and unlawfully uses force or violence upon the person of a peace officer performing his duties.  *See* Cal. Penal Code §§ 242-43.  Officer Mortimer argues that Mr. Banks willfully and unlawfully used force on him by hitting him with the passenger-side door as Mr. Banks tried to get out of the Volkswagen.  *See* Mot. at 16.  Relatedly, Officer Mortimer contends that Mr. Banks "was not responding to [his] commands" and therefore violated California Penal Code § 148(a)(1), which makes it a misdemeanor to willfully resist, delay, or obstruct any peace officer in the discharge or attempt to discharge their duties.  Cal. Penal Code § 148(a)(1).

The problem with these arguments, though, is that they exclusively rely on Officer Mortimer's version of events.  This gets the summary judgment standard backwards.  *See Tolan*, 572 U.S. at 656-57 (holding that "under either prong [of the qualified immunity analysis], courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment" and "must view the evidence 'in the light most favorable to the opposing party'") (citations omitted).  When Ms. Caldwell's testimony is also considered and viewed in a favorable light, the factual record becomes muddier.

For example, there are genuine issues of material fact as to the timing of events.  Logically, Officer Mortimer could only have probable cause to arrest if he saw Mr. Banks commit the alleged misdemeanors *before* he arrested him by striking him with the flashlight.  But as to the battery allegation, Ms. Caldwell appeared to recall that Mr. Banks pushed the passenger side door open only *after* Officer Mortimer struck him with a flashlight.  *See* Dkt. No. 93 at 48 ("After being struck, Nathan pushed the door open, which put Mortimer off balance and moved him to the

17

passenger side front fender.").  Ms. Caldwell also gave testimony from which a jury could

reasonably question (1) when or whether Officer Mortimer issued verbal commands to show

hands or stay in the Volkswagen; (2) whether Mr. Banks violated that command by ultimately

opening the Volkswagen passenger door; and (3) whether any those events occurred before

Officer Mortimer struck him with the flashlight.  For example, consider the following testimony:

> Q. Okay. After Officer Mortimer tells Mr. Banks not to open the door
> or to stay in the vehicle, whatever he said along those lines, did it
> appear to you that Mr. Banks continued to try to open the door?
>
> A. Not that he tried to continue open -- it happened like so fast. So
> when he did try to open the door, it was after -- so he -- he opened the
> door a little tiny bit. And then he tried to open it a little bit more when
> Mortimer was like really close to the car. And then Mortimer had his
> weapon out. And then I want to say that that's when he opened the
> door – when Mortimer opened the door.
>
>
> Q. Do you recall Officer Mortimer ever actually saying, "Stay in the
> car"?
> A. No.
> Q. Do you recall him ever saying, "Show me your hands"?
> A. No.
> Q. Do you recall him ever saying, "Don't open the door"?
> A. No.
> Q. Okay. So do you remember any conversation that Officer
> Mortimer had with Mr. Banks as they were talking at the passenger's
> side of the vehicle?
> A. No. It didn't -- they didn't really say anything like -- no, I don't
> recall them talking because it literally happened so quick. Like I don't
> know how much of a conversation -- it really wasn't a conversation,
> nothing.

*See* Dkt. No. 93 at 23-25, 42.  And making the analysis harder, both Ms. Caldwell and Officer

Mortimer repeatedly testified that the events happened very quickly.  *See id.* at 30 ("Q. I

understand things happened fast from the point in time when Officer Mortimer drove up to the

point in time when Mr. Banks ran out of the car; right? Is that what you're saying? A. Yeah. And -

- and it's -- it literally was 10 seconds."); Mortimer Dep. at 139 ("All of this happened in -- this

whole thing happened in seconds, honestly. It's hard to break that down.").  Their testimony

reflects the uncertainty inherent in trying, years later, to faithfully reproduce a second-by-second

reconstruction of the scene.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

At bottom, summary judgment is not appropriate on an inquiry this fact-intensive and a factual record this opaque. *See Harper v. City of Los Angeles*, 533 F.3d 1010, 1022 (9th Cir. 2008) ("Where the facts or circumstances surrounding an individual's arrest are disputed, the existence of probable cause is a question for the jury."). Given the genuine disputes of material fact regarding what happened before Officer Mortimer arrested Mr. Banks by striking him with the flashlight, summary judgment on the question of whether the arrest was supported by probable cause is not warranted.

### b. Clearly Established Law

Even if Officer Mortimer lacked probable cause to arrest Mr. Banks, qualified immunity shields him from liability unless no reasonable police officer in his position could conclude they had probable cause. *See Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1443 (9th Cir. 1991). To meet this standard, Plaintiffs must show that the contours of Mr. Banks's right to be free from an unlawful seizure were "sufficiently definite" that any reasonable officer would have understood that they were violating it. *Sheehan*, 135 S. Ct. at 1774 (citations omitted). This is not an easy standard to meet. Because probable cause is a fluid and imprecise concept, the Supreme Court has stressed the need for Plaintiffs to "identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment." *D.C. v. Wesby*, 138 S. Ct. 577, 590, 199 L. Ed. 2d 453 (2018) (citations omitted and alteration adopted). They have not done so.

Plaintiffs' key case on this front is *United States v. Robertson*, which they appear to cite for the broad proposition that officers are not authorized to arrest innocent passengers. 833 F.2d 777 (9th Cir. 1987); Pls. Sup. Br. at 8. But *Robertson* did not involve remotely similar circumstances. In that case, the Ninth Circuit held that the detention of a woman found on the premises of a house containing a meth lab was an arrest that required probable cause, and that the woman's "mere proximity" to a man subject to an arrest warrant did not justify her warrantless seizure. *See Robertson*, 833 F.2d at 781-83. Here, however, there is no indication that Officer Mortimer based his probable cause to arrest Mr. Banks on his proximity to Ms. Caldwell. Aside

from the broad and abstract proposition that officers cannot arrest without probable cause, then, it is hard to find what in *Robertson* could be said to clearly establish law that is "particularized" to the facts of this case. *See White v. Pauly*, 580 U.S. 73, 137 S. Ct. 548, 552 (2017).  Plaintiffs also have not explained why this case presents the rare obvious case where specific precedent is unwarranted, and, given the hazy state of the factual record, the Court finds no basis to conclude as much.

In short, Plaintiffs have not met their burden of establishing that Officer Mortimer violated a clearly established right as defined by Supreme Court caselaw.  Summary judgment is accordingly granted as to Plaintiffs' federal unlawful arrest claim.

### ii.    Excessive Force

Plaintiffs' second claim for relief alleges that Officer Mortimer used excessive force against Mr. Banks by striking him in the head with a flashlight and by fatally shooting him.  FAC ¶ 65.

In evaluating a Fourth Amendment claim of excessive force, courts ask whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them. *Graham v. Connor*, 490 U.S. 386, 397, 109 S. Ct. 1865 (1989) (citations omitted).  To answer that question, courts in this Circuit consider: (1) the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted; (2) the government's interest in the use of force; and (3) the balance between the gravity of the intrusion on the individual and the government's need for that intrusion. *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017) (en banc).  Courts judge the reasonableness of a particular use of force from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Graham*, 490 U.S. at 396.  The Ninth Circuit has been clear that "summary judgment should be granted sparingly in excessive force cases." *C.V. by & through Villegas v. City of Anaheim*, 823 F.3d 1252, 1255 (9th Cir. 2016) (citing *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) (en banc)).

Officer Mortimer contends that he is entitled to summary judgment on Plaintiffs' excessive force claim because his use of force was "objectively reasonable" as a matter of law. *See* Mot. at 10-11. And even if his use of force was unreasonable, Officer Mortimer argues, he did not violate "clearly established" law and is therefore immune. *See id.* at 12-13. As explained below, the Court first finds that a reasonable jury could find that Officer Mortimer used excessive force both by striking Mr. Banks in the head and by fatally shooting him. It then finds that Officer Mortimer is immune from Plaintiffs' non-lethal force claim, but not necessarily from their lethal force claim.

### a. Non-Lethal Force

#### 1. Constitutional Violation

Plaintiffs' second claim alleges that Officer Mortimer used excessive force when he "caused serious injury" to Mr. Banks's head. FAC ¶ 65. Officer Mortimer contends that he is entitled to summary judgment on this claim because his flashlight strike was "undoubtedly reasonable." Reply at 5. In the Court's view, a reasonable jury could disagree with Officer Mortimer.

All force—lethal and non-lethal—must be justified by the need for the specific level of force employed. *Bryan v. MacPherson*, 630 F.3d 805, 825 (9th Cir. 2010). So as it must, the Court begins with the first *Graham* factor and analyzes the type and amount of force that Officer Mortimer used against Mr. Banks. *Lowry*, 858 F.3d at 1256. This is a "highly fact-intensive task for which there are no per se rules." *Id.* (citations omitted).

The Court finds that Officer Mortimer's flashlight strike was the kind of intermediate use of force that can significantly intrude on Fourth Amendment rights. Ms. Caldwell characterized Officer Mortimer's strike as a "hard blow" to Mr. Banks's head that left blood "everywhere," including on the Volkswagen's dashboard and on her own clothes. Dkt. No. 93 at 24, 48. This testimony is supported by that of Plaintiffs' expert Chris Coleman, who wrote in his report that "[b]lood drops were noted from around the vehicle, continued down the sidewalk, into the breezeway, and up onto the garbage cans, which all indicated that Mr. Banks was actively

21

bleeding from his forehead as he ran into the breezeway and made his way up onto the garbage cans and over the fence."  Coleman Report at 5.  As alleged, Officer Mortimer struck Mr. Banks with an impact weapon capable of inflicting significant pain.  That strike qualifies as a significant intrusion on Fourth Amendment rights.  *See Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1161-62 (9th Cir. 2011) (strikes with an impact weapon "capable of inflicting significant pain and causing serious injury" are generally considered intermediate force).  When faced with similar conduct, other district courts have reached the same conclusion.[5]

The second step is to evaluate the government's interest in the use of force.  *Lowry*, 858 F.3d at 1257.  That interest is assessed by considering: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.  *Id.* (citing *Graham*, 490 U.S. at 396).  It is in this context that Officer Mortimer claims his actions were "undoubtedly reasonable," and for support points out Mr. Banks's "failure to comply with verbal commands," "furtive movements," and Officer Mortimer's prior knowledge that Mr. Banks "was a known criminal who often carried a firearm and resists apprehension."  Reply at 5.  But a reasonable juror could find Officer Mortimer's bases for using force uncompelling for several reasons.

First, as to the severity of the crime at issue, it is unclear what, if any, crime Mr. Banks was suspected of committing when Officer Mortimer struck him with a flashlight.  Officer Mortimer admits that up until that point he had not seen Mr. Banks engage in any illegal activity.  Mortimer Dep. at 139-40.  And while Officer Mortimer claims that he struck Mr. Banks to get him

---

[5] *See Steinmeier v. Cnty. of San Diego*, No. 18-CV-1603 JM (WVG), 2020 WL 377052, at *6 (S.D. Cal. Jan. 23, 2020) ("[P]unching, kicking, and/or hitting with a flashlight are intermediate levels of force that significantly intrude on Fourth Amendment rights."); *Brown v. Grinder*, No. 213-CV-01007-KJM-KJN, 2019 WL 280296, at *8 (E.D. Cal. Jan. 22, 2019) ("Head or face strikes are a sufficiently serious intrusion upon liberty that it must be justified by a commensurately serious state interest.") (citations and quotation marks omitted); *Wakgira v. City of Seattle*, No. C08-1108-JLR, 2009 WL 2406330, at *7 (W.D. Wash. Aug. 3, 2009) (finding a use of "meaningful force" where the officer struck the suspect with a plastic flashlight at least twice on the right side of his forehead hard enough to cut or break his skin).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

to comply with his order to show hands, when the evidence is viewed in the light most favorable to Plaintiffs, it is unclear if Mr. Banks failed to follow commands or precisely when he attempted to evade arrest by flight. *See id.* at 145. As explained above, there are triable issues of fact as to (1) when or whether Officer Mortimer commanded Mr. Banks to show hands or stay in the Volkswagen; (2) whether Mr. Banks violated that command by ultimately opening the Volkswagen passenger door; and (3) whether any those events occurred before Officer Mortimer struck him with the flashlight. *See* Dkt. No. 93 at 23-25, 42. In short, a reasonable jury could review this muddy record and conclude that no crime, let alone a serious one, was at issue at the moment when Officer Mortimer struck Mr. Banks.

Second, a reasonable jury could conclude that at this point Mr. Banks did not pose an immediate threat to Officer Mortimer's safety. Officer Mortimer claims that Mr. Banks showed "furtive movements," but there are also triable questions of fact regarding Mr. Banks's demeanor. *See* Reply at 5. Ms. Caldwell, for example, recalled that Mr. Banks was "calm and relaxed" right before he was struck, "not agitated, angry, or aggressive." Dkt. No. 93 at 47-48. And while Officer Mortimer claims he had prior knowledge that Mr. Banks "was a known criminal who often carried a firearm and resists apprehension," Plaintiffs note that Officer Mortimer could not recall any specific occasions when Mr. Banks used a firearm or engaged in violence. *See* Opp. at 4 (citing Mortimer Dep. at 64-67). Viewing this record in the light most favorable to Plaintiffs, the Court finds that a reasonable juror could find Officer Mortimer's had minimal need to strike Mr. Banks with a flashlight.

And finally, a jury could also find that a reasonable officer in Officer Mortimer's position would have resolved his concerns using less restrictive means. Clear, reasonable, and less intrusive alternatives to the force employed weigh against a finding that the use of force was reasonable. *Glenn v. Washington Cty.*, 673 F.3d 864, 876 (9th Cir. 2011). And here, a reasonable juror could conclude that Officer Mortimer could and should have used a less forceful tactic.

Based on those factors, the Court finds that a reasonable jury could find that the gravity of

23

the intrusion on Mr. Banks significantly outweighed Officer Mortimer's need for that intrusion. *Lowry*, 858 F.3d at 1256. Plaintiffs have accordingly raised triable issues of fact regarding the reasonableness of the force Officer Mortimer used on Mr. Banks. Officer Mortimer is not entitled to summary judgment on this ground.

### 2. Clearly Established Law

Officer Mortimer contends that even if he used excessive force when striking Mr. Banks, he did not violate any "clearly established" right, such that he is immune from Plaintiffs' claim. *See* Mot. at 12-13. Like probable cause, excessive force is fluid. The Supreme Court has accordingly reminded lower courts that use of excessive force is another area of the law in which whether the law was clearly established "depends very much on the facts of each case." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153, 200 L. Ed. 2d 449 (2018) (citations omitted and cleaned up). Police officers are thus entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue. *Id.* The question here, then, is whether Plaintiffs have identified clearly established law in place on the night of June 16, 2017 that prohibited Officer Mortimer from using the degree of force that he did in the specific circumstances he confronted. *See O'Doan v. Sanford*, 991 F.3d 1027, 1036-37 (9th Cir. 2021). In the Court's view, they have not done so.

Plaintiffs contend that the Ninth Circuit's decision in *Young v. City of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011), clearly established Mr. Banks's right to be free from Officer Mortimer's flashlight strike. That case arose from a traffic stop where the plaintiff got out of his truck and consistently disobeyed an officer's order to reenter it. *Id.* at 1158. The officer responded by teargassing the plaintiff and striking him with a baton several times. *Id.* Construing the facts in the light most favorable to the plaintiff, the Ninth Circuit concluded that the officer's response to the plaintiff's mere failure to obey an order was "plainly in excess of the force necessary under the circumstances and thus excessive under the Fourth Amendment." *Id.* at 1167. The Ninth Circuit explained that "it is rarely necessary, if ever, for a police officer to employ

24

substantial force without warning against an individual who is suspected only of minor offenses, is not resisting arrest, and, most important, does not pose any apparent threat to officer or public safety." *Id.* at 1166-67. And it reasoned that baton blows are considered a form of "intermediate force" under *Graham* because they present a "significant use of force that is capable of causing pain and bodily injury." *Id.* at 1162.

Plaintiffs see strong parallels to *Young* here. They contend that Mr. Banks, like the plaintiff in *Young*, was struck with an impact weapon despite posing no threat to the officer and having committed no serious offense. Pls. Sup. Br. at 9. For their part, Defendants make no attempt to distinguish *Young*. *See generally* Defs. Sup. Br.

The Court agrees with Plaintiffs that two relevant legal principles were in place to guide Officer Mortimer's decision-making on the night of June 16, 2017. First, *Young* should have put any reasonable officer on notice that striking Mr. Banks in the head with an impact weapon could constitute excessive force. *See* 655 F.3d at 1162 ("A police officer's use of baton blows, too, presents a significant use of force that is capable of causing pain and bodily injury, and therefore, baton blows, like pepper spray, are considered a form of 'intermediate force.'"). Second, any reasonable officer would also have been on notice that they could not use intermediate force just because a suspect did not comply with an order. As explained in the previous section, a reasonable jury could conclude that no crime, let alone a serious one, was at issue at the moment when Officer Mortimer struck Mr. Banks. But even if this were not so, it was well established that "a failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force." *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012); *see also Young*, 655 F.3d at 1165 ("When, as here, a suspect's disobedience of a police officer takes the form of passive noncompliance that creates a minimal disturbance and indicates no threat, immediate or otherwise, to the officer or others, it will not, without more, give rise to a governmental interest in the use of significant force.").[6]

_____

[6] *See also Fuller v. Cnty. of Kitsap*, No. C16-5407 BHS, 2017 WL 5614592, at *5 (W.D. Wash.

Those two legal principles are clearly relevant to this case and they were "clearly established" when Officer Mortimer struck Mr. Banks.

But the Supreme Court has made clear that more is required to defeat Officer Mortimer's immunity. The relevant "clearly established" legal principles must also "clearly prohibit the officer's conduct *in the particular circumstances before him*." *Wesby*, 138 S. Ct. at 590 (emphasis added). The Supreme Court has demanded "specificity" in this context and has asked courts to locate existing precedent that "squarely governs" the specific facts at issue before denying immunity. *Kisela*, 138 S. Ct. at 1153. On the record before it, the Court cannot conclude that *Young* meets this standard.

The officer in *Young* used a different and arguably greater degree of force than Plaintiffs allege Officer Mortimer used here. The Ninth Circuit found the amount of force significant in *Young* because the plaintiff was exposed to pepper spray "for at least several seconds" and, in addition to landing two baton blows to the plaintiff's legs (including one while he was restrained on the ground), the officer swung the baton at the plaintiff's head "multiple times." 655 F.3d at 1162. By contrast, Officer Mortimer here allegedly struck Mr. Banks once and did not teargas him at all. *See* Dkt. No. 93 at 24, 48. It is a close call, but the Court finds that Plaintiffs have not met their heavy burden of identifying precedent that "squarely governs" the specific facts at issue here. *Kisela*, 138 S. Ct. at 1153. Plaintiffs also have not explained why this case presents the rare obvious case where specific precedent is unwarranted, and the Court finds no basis to conclude as much. Thus, Plaintiffs have not overcome Officer Mortimer's immunity. Summary judgment is accordingly granted as to Plaintiffs' excessive force claim based on Officer Mortimer's flashlight strike.

//

Nov. 21, 2017) (finding that an officer may have violated clearly established precedent "if he struck Plaintiff with his flashlight absent any indication of active resistance"); *Mackay v. City of Salinas*, No. 19-CV-02257-EJD, 2022 WL 2802981, at *11 (N.D. Cal. July 18, 2022) (collecting cases reaching the conclusion that impact strikes on a non-resisting person are likely to be excessive force).

**b.  Lethal Force**

**1.   Constitutional Violation**

Officer Mortimer also contends that it was objectively reasonable for him to use lethal force on Mr. Banks.  Mot. at 10.  The Court will not grant summary judgment on this ground.

An officer's use of deadly force is reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.  *See Gonzalez*, 747 F.3d at 793-94.  As with non-lethal force, courts consider the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.  *See Graham*, 490 U.S. at 396.  The immediacy of the threat posed by the suspect is the most important factor.  *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc).  The Ninth Circuit has recognized that an officer must give a warning before using deadly force "whenever practicable."  *Gonzalez*, 747 F.3d at 794.  Whether the officer had "alternative methods of capturing or subduing a suspect" is also relevant.  *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (en banc).  But in the end, these factors are not exclusive, and courts consider the totality of the circumstances.  *Bryan*, 630 F.3d at 826.

Any analysis of the use of deadly force must account for the reality that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Graham,* 490 U.S. at 397, 109 S. Ct. 1865.  Understandably, their judgments are sometimes informed by misperceptions of the actual surrounding facts.  But not all errors in perception or judgment are reasonable.  *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011).  While courts do not judge the reasonableness of an officer's actions with the 20/20 vision of hindsight, the Constitution also does not forgive an officer's every mistake.  *Id.*  Where an officer's particular use of force is based on a mistake of fact, courts adopt the perspective of a reasonable officer on the scene and ask whether a reasonable officer would have or *should* have accurately perceived that fact.  *Id.*

27

The central issue here is whether a reasonable jury would have to find that Officer Mortimer perceived an immediate threat of death or serious physical injury at the time he shot Mr. Banks in the head and chest. That requires an analysis of exactly what was happening when and before the shots were fired. But deadly force cases pose a particularly difficult problem because the officer is often the only surviving eyewitness. *Gonzalez*, 747 F.3d 794-95. This is one of those difficult cases. Mr. Banks is dead and cannot testify, and no other witnesses saw the fatal shooting. So this Court "must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify." *Id.* (citations omitted). That means carefully examining all the evidence in the record to determine whether the officer's story is internally consistent and consistent with other known facts, and it means considering circumstantial evidence that, if believed, would tend to discredit the police officer's story. *Id.*

Officer Mortimer's testimony is that Mr. Banks broke free from an attempted arrest and started running south. Mortimer Dep. at 159-160. As Mr. Banks ran, Officer Mortimer is certain that he saw a gun in Mr. Banks's left hand. *Id.* at 160, 187. Officer Mortimer chased him into a dark breezeway with his gun and flashlight in hand. *Id.* at 180-81. Officer Mortimer recalls telling Mr. Banks to stop running. *Id.* at 186. When Officer Mortimer turned the corner into the breezeway, he saw Mr. Banks halfway on top of a gate, as if he was straddling it, and Officer Mortimer saw a gun pointed right at him. *Id.* at 181-82, 188, 190. Officer Mortimer testified that he thought Mr. Banks was going to try to kill him. *Id.* at 208. Officer Mortimer shot towards Mr. Banks three times. *Id.* at 183-84. Based on this testimony, Officer Mortimer contends that he was "faced with an immediate and serious threat of deadly force," was "fearful of his personal safety," and "fired his weapon only to the extent necessary to subdue" Mr. Banks. Mot. at 10. When an officer has a firearm pointed directly at them, Officer Mortimer argues, "it is undeniable that every reasonable officer would respond in the same manner" as he did. *Id.* at 11.

But a reasonable jury could doubt critical elements of Officer Mortimer's account. For

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

one, there is a genuine issue of material fact as to whether Officer Mortimer ever saw Mr. Banks's gun before shooting him.  The security camera footage is inconclusive.  *See* Dkt. Nos. 89-1, 89-2 (Exs. P-7, P-8).  As Mr. Banks ran into the breezeway, one can neither see Mr. Banks's hands nor determine if anything was in them.  *Id.*  For their part, Plaintiffs adamantly argue that Mr. Banks never wielded a gun, let alone pointed one at Officer Mortimer.  As they note, Ms. Caldwell never saw Mr. Banks with a gun that night either while he was in the Volkswagen or while he ran away.  Opp. at 16-17.  And Plaintiffs' ballistics and biomechanical reconstruction expert, Dr. Wobrock, analyzed the coroner's report, autopsy photos, investigative photos, and documentation of the handgun location and concluded that "[t]he physical evidence indicates that Mr. Banks was not pointing a weapon at Officer Mortimer, while he was climbing the fence."  *See* Wobrock Report at 3.[7]  Moreover, a reasonable juror could also find the critical part of Officer Mortimer's testimony to be internally inconsistent.  Officer Mortimer testified that when he turned the corner into the breezeway, he saw Mr. Banks halfway on top of a gate, as if he was straddling it, and saw a gun pointed right at him.  *Id.* at 181-82, 188, 190.  But in Officer Mortimer's Coroner's Inquest Testimony, he testified that Mr. Banks was "not sitting on the fence waiting" but was rather "going over" the fence in "one fluid movement."  *See* Dkt. No. 93 at 192.  It would be hard, a reasonable juror could find, to climb a fence in one fluid movement and simultaneously turn and point a gun at an officer giving chase.

In short, Plaintiffs' version of events, based on the account of Jennifer Caldwell and the expert testimony of Mr. Coleman and Dr. Wobrock, is that Officer Mortimer did not see Mr. Banks wield a gun before shooting him, and that Mr. Banks was not pointing a weapon at Officer

---

[7] Both parties in this case have offered half-hearted objections to the other's reliance on expert testimony.  In their reply brief, Defendants object to the entirety of Mr. Wobrock's report on the ground that his opinions lack foundation and are unfairly prejudicial.  Reply at 15.  And in a footnote, Plaintiffs object and request exclusion of Defendants' ballistics specialist's opinion about the positioning and motion of the arm and body at the time of the shooting on the grounds that the expert is unqualified and his opinion is unreliable.  *See* Opp. at 17, n.3.  These "objections" are improper and the Court will not consider them.  The correct way to raise challenges to the substance of an expert's opinion or qualifications is through fully-briefed *Daubert* motions—not in a footnote or a reply brief.

Mortimer while climbing the fence.  If these facts are accepted, Officer Mortimer's decision to shoot obviously becomes less reasonable.  In that case, the jury could reasonably find that Officer Mortimer had no reason to fear for his own safety, and it could fault him for failing to warn Mr. Banks that he would be shot if he did not stop fleeing.  *See Gonzalez*, 747 F.3d at 794.  It might also ask why Officer Mortimer did not consider "alternative methods of capturing or subduing a suspect," like simply continuing the chase.  *City of Hemet*, 394 F.3d at 703.  At bottom, Plaintiffs' theory of the case is that Mr. Banks had done nothing more than desperately flee from a police officer who had just struck him bloody with a flashlight.  As explained above, there is evidence in the record to support that theory.  A reasonable jury could find it persuasive and conclude that Officer Mortimer did not perceive an immediate threat of death or serious physical injury at the time he shot Mr. Banks in the head and chest.

    To be clear, the Court does not mean to imply that it accepts this theory or that no juror *could* credit Officer Mortimer's testimony.  There is also evidence in the record to support his account.  For example, while Plaintiffs consistently dispute that Mr. Banks was even armed, they have not offered a coherent explanation as to why the Contra Costa County Crime Lab's DNA tests concluded that Mr. Banks "likely is the source" of the DNA obtained from the handgun submitted as evidence.  Blechman Decl., Ex. I.  They certainly have not presented evidence to suggest the gun was planted on the scene.  And while it might not make much logical sense to turn and point a gun while fleeing from an officer in hot pursuit, Mr. Banks might not have been in the best state of mind.  As the defense notes, a toxicology analysis of Mr. Banks's blood found a positive presence of marijuana and methamphetamine.  *Id.*, Ex. K.  Other factors identified in *Graham* could also support a verdict in his favor.  By the time Officer Mortimer pulled the trigger, for example, Mr. Banks was plainly resisting arrest or attempting to evade arrest by flight.  *See Graham*, 490 U.S. at 396.  In short, there are a number of hotly contested questions of fact, and Officer Mortimer could be found to have had ample reason to fear for his life or the safety of others.

30

But based on the record before it, the Court cannot say that a verdict in favor of Officer

Mortimer on the claim for excessive lethal force is the only conclusion that a reasonable jury could

reach.  In the end, Officer Mortimer had to make a split-second judgment about how much force to

use in what was a tense, uncertain, and rapidly evolving situation.  *Graham*, 490 U.S. at 396-97.

Accepting the evidence in the light most favorable to Plaintiffs, it is evident that the key

question—whether the lethal force he used was reasonable—is a matter that cannot be resolved in

favor of Officer Mortimer on summary judgment.  The Ninth Circuit has repeatedly instructed that

"summary judgment should be granted sparingly in excessive force cases" and has emphasized

that that principle "applies with particular force where the only witness other than the officers was

killed during the encounter."  *Gonzalez*, 747 F.3d at 794-95; *see also Glenn*, 673 F.3d at 871.  The

Court heeds that instruction and finds that there are triable issues of fact as to whether Officer

Mortimer used excessive force when he killed Mr. Banks.

### 2.  Clearly Established Law

Next is the second step of the qualified immunity analysis, which asks whether the Mr.

Banks's right to be free from deadly force was clearly established at the time of the shooting.  The

question is whether Plaintiffs have identified "clearly established law" in place on the night of

June 16, 2017 that prohibited Officer Mortimer from using deadly force in the circumstances he

confronted.  *See O'Doan*, 991 F.3d at 1036-37.  Viewing the record in the light most favorable to

Plaintiffs, there are facts from which the Court could conclude that no reasonable officer would

have believed they could use deadly force on Mr. Banks.  The Court accordingly finds that

summary judgment is inappropriate because genuine issues of material fact prevent a

determination of qualified immunity until after trial on the merits.

As a preliminary matter, Officer Mortimer appears to argue that Plaintiffs cannot meet the

clearly established standard because the law in fact clearly authorized his behavior.  Defs. Sup. Br.

at 6-10.  As a matter of law, he argues, officers may use deadly force when a suspect reaches

towards the area of a suspected weapon.  *Id.*  But Officer Mortimer's argument would (again) have

the Court misapply the summary judgment standard. As explained in the previous section, Plaintiffs' version of events, based on the account of Jennifer Caldwell and the expert testimony of Mr. Coleman and Dr. Wobrock, is that Officer Mortimer did not see a handgun on Mr. Banks before shooting him, and that Mr. Banks was not pointing a weapon at Officer Mortimer while he was climbing the fence. *See, e.g.*, Dkt. No. 93 at 48 (Ms. Caldwell testifying that she had an "excellent view" of Mr. Banks as he ran away and that "there is no way that he was carrying a pistol or weapon of any kind."); Coleman Report at 3 ("Mr. Banks never turned to face Officer Mortimer once he was in the breezeway."); Wobrock Report at 3 ("The physical evidence indicates that Mr. Banks was not pointing a weapon at Officer Mortimer, while he was climbing the fence."). At the summary judgment stage, the Court cannot resolve triable issues as to both of those central facts in favor of Officer Mortimer. *See Tolan*, 572 U.S. at 656-57. Once the proper standard is applied, the cases Officer Mortimer cited in his supplemental brief become inapposite because they all involve fact patterns where the suspect reached for a weapon (or what, based on objective facts, was reasonably believed to be a weapon).[8]

For their part, Plaintiffs identify three cases that they contend provide relevant and clearly established law. Two of them are non-starters, however, because they involve vastly different factual scenarios. *See Ting v. United States*, 927 F.2d 1504, 1510 (9th Cir. 1991) (suspect was allegedly shot in his home at close range while in a prone position or on his hands and knees); *Harris v. Roderick*, 126 F.3d 1189, 1203 (9th Cir. 1997) (officer who was a sniper safely located on a hill shot a retreating suspect who allegedly had made no threatening movements). They

---

[8] *See Gonzales v. City of Antioch*, No. 14-CV-04728-KAW, 2015 WL 6152781, at *18 (N.D. Cal. Oct. 20, 2015) ("It is undisputed that [suspect] was carrying a handgun when he emerged from his garage . . . . It is undisputed that he did so after he repeatedly threatened to kill a police officer—a very serious crime."), *aff'd*, 697 F. App'x 900 (9th Cir. 2017); *S.B. v. Cnty. of San Diego*, 864 F.3d 1010, 1014 (9th Cir. 2017) ("After [suspect] complied with the officers' orders to kneel, [suspect] grabbed a knife with a six-to-eight-inch blade from his back pocket"); *Centeno v. City of Fresno*, 740 F. App'x 597, 598 (9th Cir. 2018) ("Defendants reasonably believed that [suspect] was armed. A credible caller told dispatch that the suspect was armed with a handgun, and dispatch passed this information along to the responding officers, including Defendants.").

clearly do not provide existing precedent that "squarely governs" the specific facts at issue here. *Kisela*, 138 S. Ct. at 1153.  But the third case, *Curnow v. Ridgecrest Police*, 952 F.2d 321, 324 (9th Cir. 1991), presents a closer call.

In *Curnow*, police officers broke down a door to confront a domestic violence suspect.  *Id.* at 323.  The officers claimed that as they entered through the doorway, the suspect picked up a gun and raised it as he began to turn towards the officers.  *Id.*  But for summary judgment purposes, the Ninth Circuit accepted as true the contrary testimony of a witness who claimed the suspect did not have the gun in his hand, did not raise his arm, and did not turn toward the officers.  *Id.*  The officers ultimately shot the suspect in the back.  *Id.*  The Ninth Circuit denied the officers immunity and held that "the police officers could not reasonably have believed the use of deadly force was lawful because [the suspect] did not point the gun at the officers and apparently was not facing them when they shot him the first time."  *Id.* at 325.

The Court agrees with Plaintiffs that *Curnow* provides a clearly established legal principle that is relevant to the facts of this case.  That principle is that police officers may not use deadly force on a suspect that is not facing them and does not threaten them with a weapon, even if the suspect has a weapon within reach.  The Ninth Circuit has since affirmed that very reading of *Curnow*.  *See Est. of Lopez by & through Lopez v. Gelhaus*, 871 F.3d 998, 1020 (9th Cir. 2017) (finding that *Curnow* gives "'fair notice' that the use of deadly force is unreasonable where the victim does not directly threaten the officer with the gun."); *see also George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (collecting Ninth Circuit cases that held that the fact that a suspect is armed with a deadly weapon does not render the officers' deadly force per se reasonable under the Fourth Amendment).

But the "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct "in the particular circumstances before him."  *Wesby*, 138 S. Ct. at 590.  At some level of generality, *Curnow* and this case have similar facts.  As in *Curnow*, the summary judgment record here is that even if Mr. Banks was armed, he was not holding a gun or

33

threatening Officer Mortimer at the time of the shooting.  *See, e.g.*, Coleman Report at 3 ("Mr.

Banks never turned to face Officer Mortimer once he was in the breezeway."); Wobrock Report at

3 ("The physical evidence indicates that Mr. Banks was not pointing a weapon at Officer

Mortimer, while he was climbing the fence.").

Exactly how distinguishable a case may be on its facts before it cannot be construed as

clearly established law for qualified-immunity purposes is still a somewhat open question,

however.  On the one hand, the Supreme Court has repeatedly admonished courts "not to define

clearly established law at a high level of generality," and it has demanded "specificity" while

asking courts to locate existing precedent that "squarely governs" the specific facts at issue before

denying immunity.  *Kisela*, 138 S. Ct. at 1152-53 (citations and quotation marks omitted).  But at

the same time, the Supreme Court has consistently maintained that its "caselaw does not require a

case directly on point for a right to be clearly established."  *Id.* at 1152 (quotations omitted).  As

one judge has noted, this must be true "because every individual case will present at least nominal

factual distinctions" and "[i]f precisely identical facts were required, qualified immunity would in

fact be absolute immunity for government officials."  *See Easley v. City of Riverside*, 890 F.3d

851, 866 (9th Cir. 2018) (Pratt, J., dissenting), *on reh'g en banc*, 765 F. App'x 282 (9th Cir. 2019).

*Curnow* is clearly factually distinguishable.  This case involved a foot chase, while

*Curnow* involved officers breaking down a door to intercept a seated suspect they believed was

armed.  That distinction is not necessarily dispositive, of course.  The Ninth Circuit itself found

that *Curnow* constituted clearly established law in a case involving facts that were arguably more

different than the facts here.  *See Lopez*, 871 F.3d at 1020 ("*Curnow* is not identical to the present

circumstances because the victim in *Curnow* was not holding the gun . . . . Still, it gave [the

officer] 'fair notice' that the use of deadly force is unreasonable where the victim does not directly

threaten the officer with the gun."); *see also Easley*, 890 F.3d at 866 (Pratt, J., dissenting) (finding

that the "operative circumstances" in *Curnow* were present when (1) the suspect was not holding a

gun when shot even though a gun was within his reach, (2) the suspect did not point a gun at the

34

officers, and (3) the suspect did not turn to face the officers).  But arguably, a rule that deadly force is unreasonable when a victim is merely sitting in his home in the vicinity of a gun and with his back to the officer does not necessarily apply in a foot chase, where any sudden movement could be perceived as a furtive movement or harrowing gesture.  In light of the considerably high degree of specificity recent Supreme Court caselaw requires, the Court cannot find that *Curnow* provides precedent that "squarely governs" the specific facts at issue in this case.

Even if Plaintiffs have not provided a precise factual analogue, however, that does not necessarily end the matter.  None is required in an "obvious" case of constitutional misconduct. *Sharp v. Cnty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) (citing *Brosseau v. Haugen*, 543 U.S. 194, 199, 125 S. Ct. 596 (2004) (per curiam)).  To the extent that Plaintiffs present a factual scenario in which Officer Mortimer shot Mr. Banks despite not seeing him wield a weapon, they essentially allege that Officer Mortimer used deadly force on a fleeing and, to his knowledge, unarmed suspect.  In the Court's view, Plaintiffs present (at least for purposes of summary judgment) the rare "run-of-the-mill Fourth Amendment violation" for which the Supreme Court's decision in *Tennessee v. Garner*, 471 U.S. 1, 105 S. Ct. 1694 (1985), clearly establishes the unconstitutionality of the officer's conduct.  *See White v. Pauly*, 580 U.S. 73, 137 S. Ct. 548, 552 (2017).

In *Garner*, a police officer chased a man suspected of committing burglary across a yard. 471 U.S. at 3.  The fleeing suspect stopped at a fence at the edge of the yard and then began to climb over it.  *Id.*  With the aid of a flashlight, the officer was able to see the suspect's face and hands, and he saw no sign of a weapon.  *Id.*  But convinced that the suspect would elude capture if he made it over the fence, the officer shot the suspect in the back of the head, killing him.  *Id.* at 4. The Supreme Court explained that "[i]t is not better that all felony suspects die than that they escape" and held that "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."  *Id.* at 11.

35

*Garner*, too, is factually distinguishable at some level.  But if, as Plaintiffs contend, Officer Mortimer used deadly force on what was, to his knowledge, a fleeing and unarmed suspect, then Officer Mortimer committed obvious constitutional misconduct.  The Ninth Circuit has explained that "a violation is obvious enough to override the necessity of a specific factual analogue" when "it is almost always wrong for an officer in those circumstances to act as he did."  *Sharp*, 871 F.3d at 912.  It is obvious, and has been well-settled for almost forty years, that an officer may not use deadly force on an unarmed suspect just because they tried to evade arrest.  *Garner*, 471 U.S. at 4.  That is, it would always be wrong for an officer to act as Plaintiffs allege Officer Mortimer did— i.e., use deadly force on a fleeing suspect who poses no threat to the safety of the officer or others.  *See Garner*, 471 U.S. at 4; *Cruz v. City of Anaheim*, 765 F.3d 1076, 1078 (9th Cir. 2014) ("if the suspect doesn't reach for his waistband or make some similar threatening gesture, it would clearly be unreasonable for the officers to shoot him").  No reasonable officer could conclude otherwise.

Again, and to be clear, the key facts here are thoroughly contested.  And there are facts in the record from which a reasonable jury could conclude that Officer Mortimer had ample reason to fear for his life or the safety of others.  For example, Officer Mortimer says that he is certain that he saw Mr. Banks wield a gun in his left hand as he chased him.  Mortimer Dep. at 160, 187.  He is also adamant that when he turned into the breezeway saw he saw a gun pointed right at him.  *Id.* at 181-82, 188, 190.  The jury could believe him.  And if they do, then what Officer Mortimer did next would have to be viewed through a different light.

To begin with, the Ninth Circuit has held that it would be "unquestionably reasonable" for Officer Mortimer to shoot a suspect that is pointing a gun at him.  *See Cruz*, 765 F.3d at 1078 ("It would be unquestionably reasonable for police to shoot a suspect . . . if he reaches for a gun in his waistband").  And even if the jury concludes that Mr. Banks was not actively pointing a gun as he straddled the fence, it could still find that Officer Mortimer acted reasonably in pulling the trigger.  The Fourth Amendment does not require officers to delay their fire until a suspect turns his weapon on them.  *See George*, 736 F.3d at 838.  If Officer Mortimer knew that Mr. Banks was

36

armed while he fled, then any "furtive movement" or "harrowing gesture" Mr. Banks made could have created an immediate threat. *Id.* Further, qualified immunity may also apply when an officer makes a reasonable "mistake of fact." *See Pearson*, 555 U.S. at 231 ("The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'"). So what a reasonable officer in Officer Mortimer's shoes could have reasonably misperceived in those moments would also be critical.

But at this stage, all inferences must be viewed in favor of Plaintiffs. The summary judgment record is that even if Mr. Banks was armed, Officer Mortimer did not see that gun before shooting him. *See, e.g.*, Dkt. No. 93 at 48; Coleman Report at 3; Wobrock Report at 3-4. If that is true, then no reasonable officer would have used deadly force to end his flight.

Because Officer Mortimer's entitlement to qualified immunity ultimately depends on disputed factual issues, summary judgment is not appropriate as to Plaintiffs' deadly force claim. *See Lopez*, 871 F.3d at 1021 ("Because [officer]'s entitlement to qualified immunity ultimately depends on disputed factual issues, summary judgment is not presently appropriate.").[9] Clearly, the Supreme Court's qualified immunity jurisprudence has urged courts to resolve qualified immunity as a legal issue before trial whenever possible. But this approach presents a dilemma when, as here, central and disputed factual issues remain. In this scenario, "[a] bifurcation of duties is unavoidable: only the jury can decide the disputed factual issues, while only the judge can decide whether the right was clearly established once the factual issues are resolved." *Morales v. Fry*, 873 F.3d 817, 823 (9th Cir. 2017). Special interrogatories to the jury will be used to establish disputed material facts, which the Court can then rely on to determine as a matter of

---

[9] *See also Martinez v. Stanford*, 323 F.3d 1178, 1184-85 (9th Cir. 2003) (the "facts in dispute bearing on the question of qualified immunity" made summary judgment on that ground inappropriate); *Santos v. Gates*, 287 F.3d 846, 855 n.12 (9th Cir. 2002) (declining to grant qualified immunity "because whether the officers may be said to have made a 'reasonable mistake' of fact or law, may depend upon the jury's resolution of disputed facts and the inferences it draws therefrom" (citation omitted)).

37

law whether Officer Mortimer is entitled to immunity.  *See id.* at 823-24.

### iii.    Substantive Due Process

Plaintiffs also assert on their own behalf, as Mr. Banks's relatives, that they have been deprived of a familial relationship with Mr. Banks in violation of their Fourteenth Amendment right to substantive due process.  To prevail on this claim, they must prove that Officer Mortimer's use of force "shock[ed] the conscience."  *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).

The second prong of the qualified immunity analysis is dispositive and straightforward, so the Court uses its discretion to address it first.  *Pearson*, 555 U.S. at 236.  Even if a jury could reasonably find that Officer Mortimer violated Plaintiffs' Fourteenth Amendment rights, Plaintiffs have not identified any precedent that would make the right at issue "clearly established" at the time of Officer Mortimer's alleged misconduct.  *See* Opp. at 20-21; Pls. Sup. Br. at 15.  Plaintiffs' substantive due process claims would therefore still not survive summary judgment because Officer Mortimer would be shielded by qualified immunity.  The Court accordingly grants summary judgment as to Plaintiffs' substantive due process claim.

### B.    State Claims

#### i.    Bane Act

One of Plaintiffs' claims seeks relief under California Civil Code § 52.1, otherwise known as the Bane Act.  FAC ¶¶ 146-57.  Officer Mortimer contends that as a matter of law, Mr. Banks's relatives lack statutory standing to assert a Bane Act claim on his behalf.  Reply at 14.  Even if such a claim could be raised, he argues, Plaintiffs have failed to show that he had the required "specific intent" to violate Mr. Banks's constitutional rights.  The Court disagrees on both fronts. *Id.*

The Bane Act was enacted to address hate crimes.  *Reese v. County of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018).  It allows a person to sue anyone who "interferes by threats, intimidation or coercion, with the exercise or enjoyment" of any constitutional or statutory right. *See* Cal. Civ. Code § 52.1.  The elements of a Bane Act claim are essentially identical to the

elements of a § 1983 claim, with the added requirement that the government official had a "specific intent to violate" a constitutional right. *See Hughes v. Rodriguez*, 31 F.4th 1211, 1224 (9th Cir. 2022) (citing *Reese*, 888 F.3d at 1043).

Officer Mortimer notes that the Bane Act specifically and only allows persons to bring lawsuits "in their own name and on their own behalf." *See* Cal. Civ. Code § 52.1(c) ("Any individual whose exercise or enjoyment of rights . . . has been interfered with . . . may institute and prosecute *in their own name and on their own behalf* a civil action") (emphasis added). Because only living plaintiffs can bring a Bane Act claim on their own behalf, his argument goes, Mr. Banks's relatives lack standing to do so. Reply at 14.

As an initial matter, Officer Mortimer improperly raised this argument for the first time in his Reply Brief. It therefore need not be considered. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."). But it is a meritless argument, in any event, and the Court will explain why.

The argument is rooted in a California appellate court's decision in *Bay Area Rapid Transit Dist. v. Superior Court ("BART")*, 38 Cal. App. 4th 141, 144 (1995). There, the court dismissed a Bane Act claim brought by parents who alleged that the officer who shot their son "interfered with their constitutional right to parent." *Id.* at 144. The court explained that the Bane Act "is simply not a wrongful death provision" because it only "provides for a personal cause of action for the victim of a hate crime." *Id.* Because the Bane Act does not provide for "derivative liability for persons not present and not witnessing the actionable conduct," the court found that the parents lacked standing to bring their claim. *Id.*

Many defendants before Officer Mortimer have argued that *BART* means that parents may never bring a Bane Act claim on behalf of a decedent. And many courts before this one have rejected that reading of *BART*. *BART* only held that parents cannot bring a Bane Act claim on a wrongful death basis to recover for a violation of *their own rights*, like the right to parent. It said nothing about whether parents can recover as successors in interest for a violation of their

39

deceased child's rights, like the right to be free from an unreasonable seizure. Courts in this Circuit have accordingly found that even though the Bane Act is not a wrongful death provision, a decedent's successor-in-interest has standing to assert a Bane Act claim on the decedent's behalf. *See J.G. v. City of Colton*, No. 5:18-CV-02386-RGK-SP, 2019 WL 4233582, at *3 (C.D. Cal. July 1, 2019) (collecting cases that have allowed successors-in-interest to bring Bane Act claims). This Court agrees.

The distinction makes sense. Unlike a wrongful death claim, a survival claim is not a new cause of action that vests in heirs after the death of the decedent. *See Moore ex rel. Moore v. Cnty. of Kern*, No. 1:05-CV-1115-AWI-SMS, 2007 WL 2802167, at *6 (E.D. Cal. Sept. 23, 2007) (citing *Grant v. McAuliffe*, 41 Cal. 2d 859, 864, 264 P. 2d 944 (1953)). It is rather an existing "cause of action [that] belonged to the decedent before death but, by statute, survives that event." *Id. BART* accordingly did not hold that Bane Act claims cannot survive death and most courts do not interpret it that way. They instead read *BART* to be consistent with California's survival statutes, which make clear that an injured party's cause of action is "not lost by reason of the person's death" and can generally be brought by the decedent's successor-in-interest. Cal. Civ. Proc. Code §§ 377.20(a), 377.30. [10]

With those principles in mind, the standing analysis becomes easy. The Complaint says that Plaintiffs bring their Bane Act claim as "successors-in-interest." FAC ¶ 157 ("Plaintiffs bring this claim as successors-in-interest to Decedent"). The cause of action originally belonged to Mr. Banks, and it survived his death. His successors-in-interest now have statutory standing to assert it.

As to the substance of Plaintiffs' Bane Act claim, the Court finds that summary judgment is unwarranted for two reasons. First, as discussed above, the Court has concluded that a reasonable jury could find that Officer Mortimer acted unreasonably by arresting Mr. Banks

---

[10] *See also M.H. v. Cnty. of Alameda*, 62 F. Supp. 3d 1049, 1096 n.11 (N.D. Cal. 2014); *Wallisa v. City of Hesparia*, 369 F. Supp. 3d 990, 1020 n. 12 (C.D. Cal. 2019); *Rodriguez v. United States*, No. 06-CV-2753 W (JMA), 2009 WL 10672165, at *8 (S.D. Cal. Aug. 3, 2009).

without probable cause and using excessive force on him.  Intimidation and coercion are inherent

in those acts.  *See, e.g.*, *Schmid v. City & Cty. of San Francisco*, 60 Cal. App. 5th 470, 483 (2021)

("Any arrest without probable cause involves coercion, and where accompanied by evidence of

specific intent to violate the arrestee's Fourth Amendment rights, such an arrest may provide the

basis for a Bane Act claim."); *Reese*, 888 F.3d at 1043 (explaining that "the Bane Act does not

require the 'threat, intimidation or coercion' element of the claim to be transactionally independent

from the constitutional violation alleged.").

   Second, there are facts in the record from which a reasonable jury could find that Officer

Mortimer had a "specific intent" to violate Mr. Banks's constitutional rights.  When an officer

violates "clearly delineated and plainly applicable" constitutional rights, specific intent may be

shown by "[r]eckless disregard of the 'right at issue.'"  *Cornell v. City & Cty. of San Francisco*,

17 Cal. App. 5th 766, 803, 804 (2017); *see also Sandoval v. Cnty. of Sonoma*, 912 F.3d 509, 520

(9th Cir. 2018).  At least as alleged, the core rights at issue in this case are clearly delineated and

plainly applicable.  As explained in detail above, Plaintiffs' lethal force claim is not novel.  It

alleges that Officer Mortimer used deadly force on a fleeing suspect who posed no threat.  Given

the blatancy of the alleged constitutional misconduct, a reasonable jury could conclude that

Officer Mortimer acted in "reckless disregard" of Mr. Banks's rights.  That is sufficient.[11]  At

bottom, the Court finds that whether Officer Mortimer used excessive lethal force, and whether he

had a specific intent to do so, are questions properly reserved for the trier of fact.[12]

   **ii. False Arrest, Battery, and Negligence**

[11] *See S.R. Nehad v. Browder*, 929 F.3d 1125, 1142, n.15 (9th Cir. 2019) ("Although Bane Act claims do require the specific intent to deprive a person of constitutional rights, such intent can be proven by evidence of recklessness."); *Ochoa v. City of San Jose*, No. 21-CV-02456-BLF, 2021 WL 7627630, at *16 (N.D. Cal. Nov. 17, 2021) (explaining that "courts have considered recklessness sufficient to meet *Cornell*'s specific intent requirement"); *J.G. v. City of Colton*, No. 5:18-CV-02386-RGK-SP, 2019 WL 4233582, at *4 (C.D. Cal. July 1, 2019) (finding a plausible allegation of specific intent where the officer fired several shots at decedent even though decedent did not advance towards the officer or otherwise pose a threat).

[12] *See Hughes v. Rodriguez*, 31 F.4th 1211, 1224 (9th Cir. 2022) ("Whether Officer Michael Rodriguez used excessive force in violation of Hughes's constitutional right, and whether he had a specific intent to do so, are questions properly reserved for the trier of fact.").

The Complaint brings false arrest, battery, and negligence claims that flow from the same facts as their § 1983 Fourth Amendment claims. *See* FAC ¶¶ 123-33 (false arrest); 134-39 (battery); 140-45 (negligence). Courts generally analyze these claims under the same rubric as § 1983 claims based on the Fourth Amendment.[13] Because the Court has already found that triable issues of fact exist as to whether Officer Mortimer violated Mr. Banks's Fourth Amendment rights, it reaches the same conclusion on the state law claims.

## IV.   CONCLUSION

Defendants' motion for summary judgment is **GRANTED IN PART and DENIED IN PART**. Specifically, the motion is granted as to Plaintiffs' (1) claims against Officer Ryan White; (2) claims against all Defendants based on the denial of medical care theory; (3) § 1983 unlawful arrest claims against Officer Mortimer; (4) § 1983 non-lethal excessive force claims against Officer Mortimer; and (5) § 1983 substantive due process claims against Officer Mortimer. The motion is otherwise denied. Defendant Officer Ryan White is dismissed from this lawsuit.

**IT IS SO ORDERED.**

Dated:   8/9/2022

HAYWOOD S. GILLIAM, JR.
United States District Judge

---

[13] *See Garcia v. Cnty. of Merced*, 639 F.3d 1206, 1213 (9th Cir. 2011) (false arrest); *Avina v. United States*, 681 F.3d 1127, 1131 (9th Cir. 2012) (battery); *Diaz v. Cnty. of Ventura*, 512 F. Supp. 3d 1030, 1048 (C.D. Cal. 2021) (negligence).